## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ERIC BAZIS**, | |
| *Plaintiff*, | **CIVIL ACTION** |
| *v.* | **No. 24-3818** |
| **REWORLD PROJECTS, LLC, ET AL.**, | |
| *Defendants*. | |

### MEMORANDUM OPINION

Henry, J. *s/CH*                                                                April 8, 2025

Eric Bazis filed a complaint in state court alleging that he was illegally fired from his position at a waste incineration plant. Defendants, including the plant owner, a supervisor, and an HR employee, removed the case to federal court, claiming that the HR employee was fraudulently included as a scheme to keep the case out of federal court. The Defendants raise strong objections to the legal basis for naming Richardson as a defendant to the present suit. Nevertheless, because I cannot rule that out as a matter of state law, I must grant remand and return the case to Delaware County for further proceedings.

### I.    BACKGROUND AND PRESENT POSTURE

#### A.  Bazis's Allegations

Plaintiff Eric Bazis filed a state suit against defendants Reworld Projects, LLC; Chelsey Richardson;[1] and Larry A. Smith, Jr. in Delaware County, Pennsylvania on June 19, 2024. The following facts are alleged in his complaint, ECF No. 1-1: Bazis was an employee of Reworld, as

---

[1] Defendants correct the spelling of Ms. Richardson's first name from "Chelsea" as pleaded in the Complaint. ECF 6-1 ("Memo") at 1 n.1.

well as its corporate predecessors. ¶ 13. He served as an "operations supervisor" at the company's Delaware Valley waste incineration plant. *Id*. ¶ 15. As part of his duties, he monitored the chemical composition of airborne emissions and ash byproduct. *Id*. Plant managers instructed Bazis to set filtration settings to emit sulfur dioxide, a harmful pollutant, as close to the legal concentration limit at that plant of 29 parts per million (ppm) as possible. *Id*. ¶¶ 17–18. That sometimes resulted in emissions levels temporarily exceeding the legal limit. *Id*. The company (as its corporate predecessor Covanta) also instructed Bazis as an ongoing matter to alter the filtration settings during periods when the Pennsylvania Department of Environmental Protection performed annual "stack testing" at the plant to permit a much lower threshold of 7 ppm. *Id*. ¶ 19.

Around May 2023, someone at the company's environmental team based in New Jersey directed Bazis to change how his team measured the pH level of ash byproduct. *Id*. ¶ 20. Based on his own "substantial knowledge and experience," Bazis believed this would result in false measurements being sent to the local landfill. *Id*. ¶ 21. On June 7, 2023, Bazis joined a meeting to discuss preparations for state testing in lieu of a higher-up who was unavailable. *Id*. ¶ 22. At that meeting were an unnamed member of the New Jersey-based environmental team, the stack testing director Rick Kohler, and Bazis's supervisor Larry A. Smith. *Id*. ¶¶ 23–24. During the June 7 meeting, Kohler instructed Bazis to again set sulfur dioxide emissions to the lower level during stack testing. *Id*. ¶ 24. Bazis expressed opposition to the protocol, and he added that he had been directed to "improperly alter" the way the plant measured pH in ash byproduct. *Id*. ¶ 24–25. Smith immediately ended the meeting and suggested continuing the conversation "off-line." *Id*. ¶ 25. Bazis was not included in any further conversations regarding the testing protocols. *Id*. ¶ 27.

About a month later, on July 6, 2023, Smith commented to Bazis at the conclusion of a team meeting that, "[I]f I were getting fired today, I'd talk to an environmental lawyer." *Id*. ¶ 33.

That same afternoon, Smith and (also individually-named defendant) Human Resources Director Chelsey Richardson summoned Bazis to a meeting. Richardson accused Bazis of having made fallacious overtime submissions. *Id*. ¶ 34. The allegation related to a practice of Bazis's reporting overtime over the prior five-year period for work done at home beyond 40 hours weekly, often during outages at the plant, which had recently increased. *Id*. ¶¶ 28–32. A prior supervisor Bill Quill had directed Bazis to make these submissions beginning in 2018. *Id*. ¶ 28. During the July 6 meeting, Richardson threatened to call the police and suspended Bazis's employment. ¶ 34. On July 11, five days after the July 6 meeting, Bazis received a letter from Richardson notifying him of his termination. *Id*. ¶ 35.

The above factual recitation is constrained to the Complaint, but in the briefing of the present motion, both the Defendants and Bazis submitted affidavits as exhibits. First, on August 29, 2024, Defendants filed a Declaration of Chelsey Richardson with their memorandum in opposition. ECF 13-1. In that declaration, Richardson states that her involvement relating to the allegations in the Complaint was limited to reviewing his overtime entries, meeting with him on July 6, and sending the termination letter. *Id*. ¶ 3.

Next, on September 5, 2024, Bazis filed a Declaration of Eric Bazis as an exhibit to his reply in support of remanding. ECF 14 at 15. In that declaration, Bazis states that he was responsible at the plant for reporting emissions levels to the United States Department of Energy and for overseeing the submission of samples to the Pennsylvania Department of Environmental Protection. *Id*. ¶¶ 3–6. Bazis adds that Richardson was functionally in charge of personnel decisions at Reworld. *Id.* ¶ 8. Finally, he adds that Smith was previously aware of Bazis's practices with overtime but never expressed concern until the day of the meeting with Richardson. ¶¶ 10–12.

The parties agree that Plaintiff Bazis and Defendant Richardson are citizens of Pennsylvania, that Defendant Smith is a citizen of Delaware, and that Defendant Reworld is a citizen of Delaware and New Jersey.

### B. Procedural Background

In Count 1, Bazis sued Reworld under New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. § 34:19-1 *et seq.* In Count 2, he sued all three defendants for wrongful discharge in violation of public policy under Pennsylvania law. The complaint did not allege a particular amount in controversy, but requested both monetary and equitable relief, as well as attorneys' fees.

On August 5, 2024, all three defendants timely noticed removal of the case to this Court. According to their Notice, Chelsey Richardson was improperly sued as a joined defendant. ¶ 12. The notice alleged that her joinder served only fraudulently to defeat complete diversity, and therefore her citizenship should be disregarded. The notice alleged generally that the amount in controversy exceeded the jurisdictional threshold of $75,000. ¶ 35 (claiming that the sum of "compensatory damages, financial loss, punitive damages and attorney's fees, and other damages, . . . easily exceeds the statutory threshold" given that both back pay, front pay, and benefits since the termination in 2023 may be recovered under CEPA).

On August 12, 2024, Defendants separately moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(b).

On August 15, 2024, Bazis moved to remand the case to the Delaware County Court of Common Pleas, defending Richardson's joinder as proper and therefore divesting this Court of jurisdiction that would stem from complete diversity of Bazis with the defendants. Bazis also

moved to hold the motion to dismiss in abeyance pending the outcome of the motion to remand, which the Court on August 19 granted.[2]

## II.  <u>STANDARD OF REVIEW</u>

Upon the defendant's notice, a case may be removed from state court to federal court based on the federal court's original jurisdiction, which may be based on the complete diversity of the defendants with the plaintiff. 28 U.S.C. §§ 1332, 1441. However, if at any time before final judgment the court determines that it lacks subject matter jurisdiction, it must remand the case. *Id*. § 1447(c). The Supreme Court has commanded that federal courts "should not sanction devices intended to prevent a removal to a Federal court where one has that right." *Wecker v. Nat'l Enameling & Stamping Co., 204 U.S. 176, 186 (1907)*. Federal courts must nevertheless apply strong skepticism to removal, requiring the removing party to carry a "heavy burden of persuasion." *Steel Valley Author. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1012 n.6 (endorsing the "strict standard" under *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 550 (5th Cir. 1981)).

The validity of removal in a putative diversity case rests on the validity of the bases for that jurisdiction: The actual complete diversity of the parties (as well as the sufficiency of the amount in controversy, which is not at issue here). Where a question is raised as to whether the alleged diversity is valid, the doctrine of fraudulent joinder has permitted courts to disregard the non-diversity of a defendant whose joinder is improper. In the Third Circuit, joinder is determined to be "fraudulent" where "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against

---

[2] During the pendency of the motion, I joined the bench, and the case was transferred administratively to my docket.

the defendants or seek a joint judgment." *In re Briscoe*, 448 F.3d 201, 216 (3d Cir. 2006). Conversely, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (citation removed). The court must not itself inquire into its own view of the merits of any claims against a diversity-ending party, insofar as there are "colorable" claims asserted. *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992). In considering whether claims are colorable, the court must both assume the truth of all factual allegations in the complaint and "resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *Id*. at 851–52. A claim can be disregarded where it is "wholly insubstantial and frivolous." *Id*. at 852. But the standard is <u>not</u> one in which the court itself determines the actual legality of the suit as it would upon a Rule 12 motion. *Id*. For instance, in *Brown v. JEVIC*, 575 F.3d 322 (3d Cir. 2009), the Third Circuit considered the joinder of a party in bankruptcy proceedings against whom the action had been stayed by statute. In such a situation, joinder was "plainly improper," and the joinder did not prevent federal jurisdiction. *Id*. at 326. The court compared the situation to one in which an action is barred against the joined defendant by the statute of limitations, which the Seventh Circuit has held sufficient to determine a defendant was fraudulently joined. *Id*. at 327 (citing *LeBlang Motors, Ltd. V. Subaru of Am., Inc.*, 148 F.3d 680, 690 (7th Cir. 1998)).

On the other hand, *Batoff* is a particularly instructive case in which the district court's dismissal of a putatively fraudulent codefendant was overturned. Batoff was a psychologist who worked with motor vehicle accident victims. 977 F.2d at 849. State Farm employed a rival expert (and rival Pennsylvanian) Paul who among other things disparaged Batoff. *Id*. The district court

ruled that because a corporation cannot conspire with its employee, and Paul was not "otherwise [] legally responsible" to Batoff, he could be dismissed and diversity made complete. *Id*. The Third Circuit, however, held that the district court had gone too far. By determining that Batoff had "fail[ed] to state a valid claim" against Paul, it had impermissibly converted the jurisdictional inquiry into a motion to dismiss. *Id*. Whereas the Rule 12(b)(6) standard demands that a court rule on whether a claim can legally stand, the question for remand is whether any state court might itself rule as much. Thus, Batoff won remand because "a Pennsylvania court *might hold*" that his complaint would survive a motion to dismiss. *Id*. at 852–53 (emphasis added). The Circuit overturned the district court's reading of Pennsylvania law even where it "may have been correct in its understanding" where the holding it drew on was "not so clearly controlling . . . that its very existence renders Batoff's claims against Paul wholly insubstantial and frivolous." *Id*. at 853.

When considering whether a case must be remanded, the district court must "focus on the plaintiff's complaint at the time the petition was filed." *Abels v. State Farm Fire & Casualty Co*., 770 F.2d 26, 29 (3d Cir. 1985). A "limited look" outside the pleadings, including to the record from prior proceedings or "other relevant matters that are properly subject to judicial notice" is permitted inasmuch as it does not "risk crossing the line between a proper threshold jurisdictional inquiry and an improper decision on the merits." *Briscoe*, 448 F.3d at 219–20.

## III. **DISCUSSION**

Defendants raise several valid issues with the merits of this case. Both the relevant cause of action and the choice of defendant are of highly questionable legality. What the Defendants are unable to do at this stage, however, is carry the heavy burden of demonstrating that the present claims against Richardson are "wholly insubstantial and frivolous." Because a Pennsylvania court "might hold" that Bazis was wrongfully terminated, that Richardson could be sued as a participant

7

in that termination, and that the Complaint sufficiently alleged her participation, I must grant remand. *Batoff*, 977 F.2d at 852–53.

### A. Wrongful Termination Against Public Policy

Bazis's claim against Richardson is for wrongful termination, a tort under Pennsylvania law. There is ample reason to doubt the eventual success of Bazis's claim that his termination was unlawful because it was against the public policy of Pennsylvania. First, it is set against the clear and "extremely strong" presumption that non-contractual work in Pennsylvania is at-will, and that a business may therefore fire its employee without cause. *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000). Although an employee may bring suit for wrongful termination that goes against public policy, these suits are permitted "only in the most limited of circumstances where the termination implicated a clear mandate of public policy in this Commonwealth." *Id.* The question of what constitutes "public policy" is "ascertained by reference to the laws and legal precedents," and ultimately a legal determination made by the Pennsylvania courts. *Id.* at 288 (stating that after reviewing the statutes and case law "*we* declare" the public policy (emphasis added)).[3]

Bazis claims that the Defendants fired him for raising objections about the way chemical emissions testing was being done and reported. The parties have not provided any case law to demonstrate that Pennsylvania courts have addressed whether incorrect reporting of the kind Bazis alleges he was asked to do is itself against Pennsylvania public policy. At best, Bazis offers that it

---

[3] The Supreme Court of Pennsylvania noted in *McLaughlin* that it would not declare as a rule that federal statutes are themselves a basis for ascertaining public policy of Pennsylvania, but noted that there could be overlap, such as with OSHA. 750 A.2d at 289. In the present case, Bazis draws explicit reference only to a *state* law criminalizing tampering with government records, 18 Pa.C.S. § 4911(a), although he also states in his declaration that his reporting duties additionally included reporting to federal authorities.

is sufficiently against public policy where an employer "compels the employee to engage in criminal activity[.]" *Zorek v. CVS Caremark Corp.*, No. 13-1949, 2014 WL 12487695, at *3 (M.D. Pa. Apr. 16, 2014). He cites 18 Pa.C.S. § 4911(a), which criminalizes tampering with public records or information, including, *inter alia*, by "mak[ing] a false entry in, or false alteration of, any record . . ." or "mak[ing], present[ing] or us[ing] any record . . . knowing it to be false, and with intent that it be taken as a genuine part of information or records," kept for government information. Bazis was an operations supervisor at the plant, and he pleads that by altering the measurement techniques as directed, he would have caused false measurements to be sent to the Delaware County landfill. Compl. ¶¶ 15, 20–21.

Defendants argue that the tampering law would not even apply, since Bazis was not directed to "make any false entry," having not been "responsible for making entries in records".[4] They have a point, but it is better directed to a state court. For the purposes of whether a state court might hold that tampering covers such conduct, I note that the Complaint pleads that 1) Bazis supervised a plant that provided official reports, 2) he was directed to change the way that those reports were produced, despite 3) his knowledge that the reports would now provide false information, and 4) he was fired shortly upon raising concerns about the directive. I cannot

---

[4] Defendants cite *In re Private Crim. Complaint of Jerome Coffey*, No. 464 WDA 2012, 2013 WL 11283195, 2013 Pa. Super. Unpub. LEXIS 2274, at *4 (Pa. Super. Ct. 2013) for the elements of the crime Bazis alleges he would have had to violate, but that case is of limited assistance. In *Coffey*, a prisoner alleged that a correctional officer had knowingly falsified entries in an Initial Review Response. *Id* at *1. There was "no question" that he had made an entry, *id.* at *2, and the court's analysis was entirely based on one alternative of the pattern jury instructions. As shown by the statute text quoted here, and contrary to Defendant's argument, it may be sufficient to "present" such an entry to be liable under Section 4911(a). In any event, it is separately plausible that a person "makes" or "alters" an entry in an generated emissions report when he does something to the testing analysis that affect the outcome of the report (but not the actual underlying conditions.

foreclose the argument that changing a measurement protocol to register false values in an officially submitted report is tampering under § 4911(a). And I am particularly concerned not to impose my own judgment on the extent to which § 4911(a) dictates the public policy of Pennsylvania, since "the extent to which public policy limits an employer's control over his business must be determined on a case by case basis." *Field v. Philadelphia Elec. Co.*, 565 A.2d 1170, 1179. Lacking any on-point case law and in view of the considerable room left by the statute to discern criminality in what Bazis was instructed to do, I must conclude that it was a plausibly wrongful termination against the public policy of Pennsylvania.

### B.  Whether Richardson May Be Individual Liable

The cause of action having survived, the next concern is its attachment to Richardson herself. As the Defendants put it in their Notice, "it is *questionable* whether a claim of wrongful discharge is possible against defendants in their individual capacity." Notice of Removal, ECF No. 1 ¶ 16 (emphasis added).[5] They are right that grave questions attach. Unfortunately for them, the standard for remand is so low that even "questionable" liability will suffice to require remand; it is not for this Court to determine the merits. Therefore, although Defendants raise strong reasons why a claim against Richardson is unlikely to prevail and may not survive scrutiny in state court, it must be left for a Pennsylvania court to determine.

#### i.  *Employee Participation Theory Under Pennsylvania Tort Law*

First, as the Defendants' use of "questionable" concedes, it is plausible that an individual connected to a wrongful discharge may be liable in Pennsylvania. "While it is clear that the fellow employees of the plaintiff cannot be successfully joined as defendants on contract or contract-

---

[5] Defendants' statement in context was meant to apply only to individual liability in Pennsylvania, but for the reasons in this section, I find "questionable" the sufficiency of the Complaint as pertains to Richardson as well.

related causes of action, their status is far from clear on other theories of recovery." Richard J. Kohlman, Wrongful Discharge of At-will Employee, 31 Am. Jur. Trials 317 § 23 (Feb. 2025). Pennsylvania law is unclear enough on this point that federal courts have disagreed on how to read it. *Brennan v. Cephalon, Inc.*, No. CIV.A. 04-3241 (FLW), 2005 WL 2807195, at *12 (D.N.J. Oct. 25, 2005) (recognizing disagreements and ultimately dismissing individual defendants because a claim had not been adequately pleaded as to their individual involvements, while granting leave to amend).

The state of Pennsylvania law certainly does not suggest the clear legal impossibility of such action in the manner of the statutory bars (limitations, bankruptcy stays) recognized in *Brown v. JEVIC*. It affirmatively recognizes some participation theory of liability by corporate officers. *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 622 (1983); *see McGovern v. Jack D's, Inc.*, No. CIV.A. 03-5547, 2004 WL 228667, at *3 (E.D. Pa. Feb. 3, 2004) (recognizing possibility of individual liability, but dismissing *at Rule 12* stage where pleadings did not allege individual officers "were complicit" and therefore came closer to "nonfeasance"), *modified on reconsideration*, No. CIV.A. 03-5547, 2004 WL 632703 (E.D. Pa. Feb. 25, 2004) (determining upon reconsideration that complaint did adequately plead direct participation). In *Wicks*, the Pennsylvania Supreme Court considered a suit by homeowners plagued by drainage problems against the builder and its officers sounding in tort. The court noted that a tort suit against the officers of a corporation (as well as the corporation itself) was not barred by existing clear rules against holding officers to their corporation's contract or requiring special allegations to pierce the corporate veil. *Id*. at 619–21. Instead, the corporate participants in *Wicks* were liable "where the record establishes the individual's participation in the tortious activity." *Id*. at 621.

11

What *kind* of participation is sufficient for liability is not as clear. At the very least, *Wicks* cites approvingly the description in a treatise that even an officer who "takes no part in the commission of the tort" may be liable if "he specifically directed the particular act to be done or participated, or cooperated therein." *Id.* at 621–22 (citing 31 Fletcher, *Cyclopedia of the Law of Private Corporations* § 1137, p. 207 (perm. Ed. Rev. 1975)) (reframed from the contrapositive); *cf. Chester-Cambridge Bank & Tr. Co. v. Rhodes,* 346 Pa. 427, 432 (1943) (fact of being bank president "does not serve to make him liable for the misconduct of other officers merely by virtue of his office" where president neither had notice nor participated in tort, but noting that officers may have personal liability where they knowingly participate in a wrongful act").

Although the breadth of what counts as sufficient participation is unclear, the facts in *Wicks* are instructive. There, plaintiff homeowners alleged the individual defendants had merely *been aware*, or *should have been* aware from "experienced observations," that the site of the proposed development on a slope could create drainage issues. *Id.* at 618–19. Since they negligently failed to order soil testing to assess the need for special arrangements, the homeowners suffered flooding with chemical and biological runoff. *Id.* at 617. The individual defendants in *Wicks* were the president, vice president, and secretary of the building company, but the opinion notes no further direct involvement with the tortious conduct. Given that the Pennsylvania Supreme Court ruled that *that* level of involvement is sufficient "participation" (at the level of a demurrer), I cannot conclude that it could not also rule that, with a wrongful termination claim, the company officer is liable who calls the meeting at which the plaintiff is fired, threatens police action, and signs the termination letter.

*ii. Sufficiency of Pleadings as to Richardson's Participation*

Defendants next respond that because the Complaint lacks any allegations regarding her own actions, Richardson is an inappropriate defendant even under a participation theory. The Complaint is very limited as to Richardson's involvement. I still do not find under the present standard that the pleadings are so barren as to make Richardson's liability a legal impossibility.

Defendants claim that Richardson could not be held liable because there are no allegations as to her having engaged in misfeasance, citing *Wicks* for the proposition that a misfeasance is a necessary condition for liability. First, as discussed above, a participation theory in Pennsylvania does not appear to require a showing of misfeasance under *Wicks*; the decision is barren as to anything of the kind, in that the defendant corporate officers are described only as such. *Wicks* (and its citation to *Chester-Cambridge Bank*) does however leave aside from the participation theory a corporate officer who neither participates nor has notice of the alleged tort. 503 Pa. at 621–22 (stating officers "may not be held liable for mere nonfeasance" and noting the latter decision to hold non-liable officer who knew nothing about the tort). The question therefore is whether the pleadings sufficiently allege that Richardson was aware of the underlying tort.[6]

Defendants argue that the Complaint fails to allege that she had any knowledge as to Bazis's complaints, but I read it to have (plausibly) pleaded circumstantial facts that draw Richardson into the decision to impermissibly terminate Bazis as a knowing participant. Smith

---

[6] The resolution of this question in the specific area of wrongful termination is less clear, since a person could be aware of the termination but unaware of the causes, or that the cause was pretextual. Pennsylvania law seems to remain permissive as to liability, however. In *Kamesky v. Roemer Indus., Inc.*, 1312 C.D. 1987, 1988 WL 188472 at *2 (Pa. Comm. Pl. 1988), a plaintiff was allowed to name a defendant who was acting in his capacity as president of the company when he terminated the plaintiff against public policy. Although the president was the one who actually did the firing, there was no allegation or discussion of whether he was aware that it was against public policy and therefore illegal.

was Bazis's supervisor at the time he was terminated. ¶ 23. He was present at the June 7 meeting at which Bazis raised his objection to both the misleading emissions changes around inspection and the change in testing methods. ¶ 24–25. After Kohler directed Bazis to return to the underhanded regime of changing emissions only around the time of testing, Smith was the one who cut the meeting short, claiming that it would be finished "off-line" but never following up with Bazis. ¶ 26–27. According to the Complaint, Smith was aware of Bazis's firing before the July 6 meeting, ¶ 33, and present at that meeting, ¶ 34, but also aware that the reason given for his firing was a longtime practice about which he had not previously complained. ¶ 30. Smith also warns Bazis to hire an "*environmental* lawyer"—indicating both that Smith was aware of the pretextual nature of the firing *and*, since few people invite adversarial litigation around their own management decisions, that Smith was not the person who had decided to terminate Bazis. ¶ 33. Given that Smith was Bazis's supervisor and present with the Human Resources officer at the June 7 meeting, ¶ 34, it is very reasonable to infer that Richardson and Smith had discussed the action beforehand, and therefore that Richardson was aware that the reason given for the suspension was pretextual. Her threat to call police on Bazis in that meeting, ¶ 34, further raises the inference that she was attempting to intimidate Bazis. It would be reasonable to infer from the adequately pleaded facts that Richardson terminated Bazis with the knowledge that the reason for his termination was dubious, and given the recency of the June 7 meeting and Smith's warning, that it was in fact because of the alleged wrongful termination.[7]

---

[7] The Defendants submit a declaration by Richardson as an exhibit to their motion, but this declaration is of no assistance at this level. The kind of "limited look" that I am permitted to take beyond the Complaint at this stage is only for information that would put claims beyond any legal certainty, like a statute of limitations. *See supra* § II. Defendants cite *Accardi v. Dunbar Armored, Inc.* for the proposition that I may consider such a declaration because it "presents undisputed facts that establish with complete certainty that the non-diverse defendant has no liability." No. 13-1828, 2013 WL 4079888 at *4 (E.D. Pa. Aug 13, 2013) (cleaned up). But that

Once again, I do not determine that the facts are sufficiently pleaded to survive, only that a Pennsylvania court "might hold" that they are. Judging the sufficiency of facts in a complaint is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense[,]" a task I must leave for the Court of Common Pleas. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). At this level, the Complaint pleaded enough to infer that Richardson herself tortiously participated in terminating Bazis under *Wicks*.

## IV.  <u>CONCLUSION</u>

"If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants," I must remand this case. *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (citation removed). For the reasons given above, and for lack of jurisdiction under incomplete diversity between the parties, I therefore <u>remand</u> the case to the Court of Common Pleas for further proceedings.

---

has nothing at all to do with Richardson's declaration, which offers little more than a factual denial of her knowing liability. That may certainly be at issue at trial. *Accardi* is a particularly poor cite for the Defendants, since the court there refused to entertain the proffered declaration for functionally identical reasons, even at the Rule 12 level. *Id*. at *5.